# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| JAY F. *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WILLIAM S. HART UNION HIGH SCHOOL DISTRICT,<br><br>        Defendant. | CV 16-05117 TJH (GJSx)<br><br>Consolidated Case Nos.:<br>CV 16-05226 TJH (GJSx)<br>CV 17-00479 TJH (GJSx)<br><br>Findings of Fact<br><br>and<br><br>Conclusions of Law<br>**JS-6** |

      The Court has considered Plaintiffs Jay F., Shari L. [collectively "Parents"], and A.F.'s appeals of issues decided by the California Office of Administrative Hearings ["OAH"] in *Parents On Behalf Of Student, v. William S. Hart Union High School District*, OAH Case No. 2016020807, April 18, 2016, Decision ["Expedited Decision"] (before this Court as case number CV 16-05117 TJH) and *Parents On Behalf Of Student, v. William S. Hart Union High School District*, OAH Case No. 2016020807, October 24, 2016, Decision [the "Non-Expedited Decision"] (before this Court as case number CV 17-00479 TJH) as well as Defendant William S. Hart Union High School District's [the "District"] appeal of an issue decided in the Expedited Decision (before

this Court as case number CV 16-05226 TJH).

The Court, having considered the submitted briefs and evidence, and having heard closing arguments, now, issues the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1. The Court adopts the ALJ's factual findings in the Expedited and Non-Expedited Decisions. The Court summarizes the facts below that are relevant to Plaintiffs' first claim.

2. Starting, at least, in second grade, A.F. was disciplined for serious, threatening behaviors. Those behaviors included threatening and hitting other students, teasing and aggression toward others, emotional outbursts after engaging in behavior incidents, threatening to rape another student, and threats on social networks.

3. A.F. became eligible for special education in 2009 under the eligibility category of "other health impaired due" to Attention Deficit Hyperactivity Disorder ["ADHD"].

4. On June 2, 2010, the District amended A.F.'s Individualized Education Program ["IEP"] to include mental health services on an outpatient basis and added emotional disturbance to his IEP as a secondary eligibility.

5. In November, 2013, A.F. expressed that he did not want to exist without his girlfriend, that "this is a cruel world," and that people like his teacher did not belong there. He stated he wanted revenge on his ex-girlfriend and would not care if she died. His "revenge plan" was to get a new girlfriend to make his ex-girlfriend jealous.

6. As the 2013-14 school year progressed, A.F. made increasingly threatening statements to students that he had guns in the home, had brought pills and razor blades to school, was a member of a gang, had shot a person in the stomach, and had been kicked out of the house.

7. On May 27 2014, A.F.'s IEP team held a manifestation determination meeting followed by an IEP team meeting. The incident at issue involved Student bringing two razor blades to school ["Razor Blade Incident"]. He used the blades to cut himself on his upper arm; pulled them out in front of several students during an argument with peers and brandished the blades and swung them toward his peers; made threats to cut his peers; and made inappropriate sexual comments towards a female peer. The team concluded that the behaviors related to the razor incident were a manifestation of his emotional disturbance.

8. On October 20, 2014, the District disciplined A.F. for using a controlled substance ["Controlled Substance Incident"].

9. On January 20, 2015, while in eighth grade, A.F. threatened to bring a gun to school for the purpose of harming himself and another student ["Gun Threat Incident"].

10. On January 26, 2015, the District held a manifestation determination meeting for the Gun Threat Incident. A.F.'s threatening behavior was deemed to have been a manifestation of his disability.

11. On January 27, 2015, the District held an IEP team meeting to consider A.F.'s eligibility for special education. That IEP team meeting was facilitated by School Psychologist Laura Ramirez. The IEP team agreed that A.F. was eligible for special education under the primary category of other health impairment and secondary category of emotional disturbance.

12. At the January 27, 2015, IEP team meeting, the IEP team had knowledge of A.F.'s extensive disciplinary history, his diagnosis of a non-specific mood disorder, and the impact of A.F.'s attention-seeking and threatening behavior on his peers at school and on the District staff. The IEP team did not have time to collect all relevant data to develop a behavior intervention plan. Due to the IEP team's lack of relevant behavioral data, the IEP team agreed to hold a 30-day review meeting to develop a behavior intervention plan.

13. Directly following the January 27, 2015, IEP team meeting, A.F.'s January 27, 2015, IEP was in effect.

14. Several hours after the January 27, 2015, IEP team meeting, other students reported that Student had confronted two peers during lunch break and threatened, using profanity, to retaliate against them for "ratting" on him regarding the Controlled Substance Incident. A.F. rubbed his hands together and told the students "well this oughta be fun." When one of the students responded that he did not "rat" on Student, Student responded "that's OK I'll find out" [collectively A.F.'s misconduct on January 27, 2015, is referred to hereinafter as the "January Misconduct"].

15. On February 3, 2015, the District held a manifestation review team meeting regarding the January Misconduct. Parents attended with A.F. All of the District IEP team members were present, including Special Education Director Sharon Amrhein, and Placerita Principal Jan Hayes-Rennels, Ms. Ramirez, Assistant Principal Pam Thompson, A.F.'s special education case manager, his general education teacher, and his school counselor.

16. Ms. Ramirez completed an "IEP Manifestation Determination Assessment" ["February Manifestation Assessment"] at the February 3, 2015, meeting. She reported the behavior was seeking revenge for an incident that occurred at Placerita in October 2014. She concluded the function of the behavior was to gain peer approval and avoid peer conflict. She, also, concluded the behavior was not a manifestation of A.F.'s disability. She reasoned that, as to A.F's ADHD, school documentation reported A.F.'s impulsive behaviors occurred in the classroom; he did not follow teacher directives; he left his seat; and talked out of turn. In Ms. Ramirez's opinion, these behaviors were not consistent with the January Misconduct, which occurred during an unstructured lunch period. Ms. Ramirez determined that A.F.'s emotional disturbance caused depression and inappropriate feelings under normal circumstances. She opined that A.F.'s threats of retaliatory harm to other students on January 27, 2015, were not consistent with depression or inappropriate feelings as previously manifested by him.

17. Parents thought the District staff had predetermined that they wanted A.F. out of the District. Parents claimed that the meeting was very short. A.F.'s father thought that the District staff was throwing A.F. "to the curb[,]" that the meeting was not a team effort, and the mood was the District against Plaintiffs. Neither Parent recalled the team discussing Ms. Ramirez's conclusions on the February Manifestation Assessment. A.F.'s father. did not recall the team discussing A.F.'s behavioral history. A.F. was, then placed in home schooling pending expulsion proceedings.

18. On April 21, 2015, A.F. and his father signed an agreement suspending the expulsion [the "Agreement"]. Under the Agreement, A.F. was placed on a "probationary status subject to revocation by the [District's] governing board [the "Governing Board"] in accordance with Section G of the Agreement." Section G of the Agreement provided, *inter alia*, that A.F.'s suspended expulsion could be revoked in the event that, *inter alia*, A.F. violated the District's — or a school site's — "rules and regulations regarding pupil conduct[.]" Section G, further, provided that "[r]evocation of the suspension of the expulsion order shall result in expulsion of the Student under the terms of the original expulsion order without the benefit of a hearing."

19. A.F. began the 2015-2016 school year at Sequoia Charter High School ["Sequoia"].

20. On August 25, 2015, two Sequoia students reported to staff that, during the lunch break, A.F. captured a lizard from the side of the building, twisted its neck and broke off its head, and then dropped the carcass on the ground in the presence of other students. A.F. went to the classroom and showed the lizard's blood on his hand to other classmates, who became upset. He told them he did not feel bad about killing the lizard because he was "a psychopath." A.F., also, shared the incident with his teacher; showed the dead lizard to another classmate; and told the teacher he was reading "The Anarchist's Cookbook" [collectively A.F.'s misconduct on August 25, 2015, is referred to hereinafter as the "August Misconduct"].

21. On August 26, 2015, the District suspended A.F. from school for one day, without holding a manifestation review meeting regarding the August Misconduct.

22. On September 8, 2015, Ms. Hunter informed Parents in writing that A.F.'s one-day suspension was a violation of the Agreement, and he was immediately expelled. The expulsion resulted in a disciplinary change of placement for more than 10 days.

23. On February 19, 2016, A.F., by and through his Parents, filed a due process hearing request against the District. The request stated claims that required both an expedited and non-expedited hearing. The expedited hearing occurred on March 22-24, 29, and 30, 2016. The non-expedited hearing occurred on August 23-25, and 29-31, 2016. OAH Administrative Law Judge Adrienne L. Krikorian heard both cases.

24. After May, 2016, Parents engaged Dr. Lauren Stevenson to conduct an independent educational evaluation of A.F.

25. At the August, 2016, administrative hearing, Dr. Stevenson presented a 29-page abbreviated evaluation report. She issued a final evaluation report in November, 2016. To prepare the report, Dr. Stevenson reviewed at least 500 pages of records and met with A.F. three times for a total of about 9-12 hours. Dr. Stevenson's findings were based on: standardized testing of A.F. with multiple testing instruments, a multi-day clinical interview, and behavioral observations. Dr. Stevenson, also, spoke with Parents, one of his prior teachers, and two school psychologists. In Dr. Stevenson's independent psychological evaluation, she provisionally diagnosed A.F. with borderline personality disorder, a "very serious diagnosis." Dr. Stevenson described borderline personality disorder as the "pervasive presentation of individuals with unstable relationships and mood," and an "unstable sense of self," which "leads to attempts to avoid rejection and abandonment." Dr. Stevenson described individuals with borderline personality disorder as engaging in "self-harm and suicidal ideation," as well as aggression and anger that is "difficult to control."

26. A.F.'s borderline personality disorder "necessitates therapeutic intervention *specifically tailored* to his emotional and mental health needs" in the form of dialectical

behavioral therapy. (Emphasis in original). Dr. Stevenson explained that the research on borderline personality disorder is clear that Educationally Related Intensive Counseling Services ["ERICS"] counseling, or "treatment as usual" is not an effective intervention. Dr. Stevenson, further, concluded that A.F. "requires a comprehensive program that implements the full range of [Dialectical Behavioral Therapy or DBT] . . . services - to include a weekly individual session, a weekly group skills session, phone consultation provided as needed by the individual therapist, and the weekly therapist consultation service. All four of the above listed components are required for a program to be considered providing DBT clinical services."

27. Dr. Stevenson opined that, with dialectical behavioral therapy, A.F. should be able to develop prosocial skills, graduate from high school, and transition into an independent adult life. But she was very worried about the trajectory of A.F.'s disability without appropriate intervention.

28. Dr. Stevenson testified that she was aware of outpatient programs offering comprehensive dialectical behavioral therapy in Los Angeles County. In her November, 2016 report, she listed several such placements.

29. Any Finding of Fact erroneously categorized below as a Conclusion of Law is hereby incorporated into these Findings of Fact.

**CONCLUSIONS OF LAW**

1. Where, as here, the parties appeal an administrative decision and do not request that the Court hear additional evidence, the Court "shall receive the records of the administrative proceedings . . . and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c).

2. The Court "read[s] the administrative record, consider[s] the new evidence, and make[s] an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations." *Capistrano Unified Sch. Dist. v.*

*Wartenberg By & Through Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

3. The "[C]ourt's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference." *Capistrano*, 59 F.3d at 892. The Court gives the administrative officer's judgments particular deference when "they are thorough and careful." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

4. The Court will "not substitute [its] . . . own notions of sound educational policy for those of the" District. *Wilson v. Marana Unified Sch. Dist. No. 6 of Pima Cty.*, 735 F.2d 1178, 1183 (9th Cir. 1984).

5. "In an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

6. "A child receives a" Free Appropriate Public Education ["FAPE"], "for purposes of the IDEA, if the program addresses the child's unique needs, provides adequate support services so that the child can take advantage of educational opportunities, and is in accord with the IEP." *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1003 (9th Cir. 2017).

7. The District "must comply both procedurally and substantively with the IDEA." *L.J.*, 850 F.3d at 1003.

8. In considering whether A.F. "received a FAPE in compliance with the IDEA, the" Court must conduct both a procedural and substantive inquiry. *See L.J.*, 850 F.3d at 1003.

9. "Where a court identifies a procedural violation that denied a student a FAPE, the court need not address the second substantive prong of the inquiry." *L.J.*, 850 F.3d at 1003.

10. "Not all procedural violations constitute a denial of a FAPE." *L.J.*, 850 F.3d at 1003. "A child is denied a FAPE when procedural inadequacies result in the loss of an educational opportunity, or seriously infringe on the parents' opportunity to

participate in the IEP formulation process." *L.J.*, 850 F.3d at 1003.

11. "A procedural error is harmless if the student is substantively ineligible for IDEA benefits." *L.J.*, 850 F.3d at 1003.

12. An IEP for a disabled child is measured at the time that it was created based on the information then known. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). This evaluation standard is known as the "snapshot rule." *J.W. v. Fresno Unified School Dist.*, 626 F.3d 431, 439 (9th Cir. 2010).

**Whether the District failed to comply with the IDEA's manifestation determination provision when it failed to hold a manifestation determination team meeting regarding the August Misconduct, before the District reinstated A.F.'s previously suspended expulsion?**

13. The Court holds that the ALJ's decision of the fifth issue in the Expedited Decision was thorough and careful. Accordingly, the Court accords that decision substantial deference.

14. Further, no argument or evidence presented proves the District's claim by a preponderance of the evidence.

15. Indeed, when asked, at trial, what authority supports the proposition that the District lawfully failed to provide a manifestation hearing, the District could not point to a single authority. Instead, the District noted that California law permits the use of suspended expulsions, and the IDEA is silent as to whether the revocation of a suspended expulsion triggers the District's duty to hold a manifestation determination meeting.

16. As the ALJ observed, however, the fact that California law permits suspended expulsions, by itself, does not abrogate the District's obligations under federal law, including IDEA's requirement that the District hold a manifestation determination meeting upon deciding to change the placement of a student with disabilities.

17. Further, at trial, the District represented that its proposed reading of IDEA

would permit the District to discipline A.F. even if the August Misconduct was a manifestation of his disability. Such a result cannot be squared with IDEA's purpose to, *inter alia*, "to protect the educational rights of [disabled] . . . students." *See Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1046 (9th Cir. 2013).

18. Lastly, the Court is not persuaded that A.F. waived his rights under IDEA. The Agreement does not contain an express waiver of rights under IDEA. In fact, only California law is expressly referenced in the Agreement. As such, A.F. did not expressly waive his rights under IDEA. Moreover, to the extent that the Agreement is ambiguous, it must be interpreted against the District. *See* Cal. Civ. Code § 1654.

19. Therefore, the Court affirms the ALJ's judgment on this issue.

**Whether the District denied A.F. a FAPE under the regulations of Section 504 of the Rehabilitation Act?**

20. Plaintiffs' third claim, here, was not addressed in the Expedited or Non-Expedited Decisions.

21. As an initial matter, Plaintiffs' 504 claim was outside the jurisdiction of OAH and, therefore, is not properly before this Court.

22. Moreover, even assuming *arguendo* that the Section 504 claim was properly before the Court, Plaintiffs' third claim fails because Plaintiffs failed to present sufficient evidence.

23. To prevail on a Section 504 claim, a plaintiff must establish that, *inter alia*, he was denied the benefits of the program solely by reason of his disability. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (emphasis added). This "requires a comparison between the treatment of disabled and nondisabled children, rather than simply requiring a certain set level of services for each disabled child." *Mark H. v. Lemahieu*, 513 F.3d 922, 933, 936 (9th Cir. 2008).

24. Plaintiffs, *inter alia*, failed to present the requisite comparative analysis. Consequently, Plaintiffs have not proven their Section 504 claim by a preponderance

of the evidence.

25. Accordingly, the Court affirms OAH's dismissal of this issue.

**Whether the District denied A.F. a FAPE under the IDEA?**

26. Plaintiffs' second claim, here, is based on the ALJ's decision of all issues in the Non-Expedited Decision, and the ALJ's decision of the third issue in the Expedited Decision.

27. The ALJ's decision on these matters was thorough and careful. Accordingly, the Court accords these decisions substantial deference.

28. Further, the Plaintiffs have not proven their second claim by a preponderance of the evidence. Although the District did commit a number of procedural violations throughout the relevant period, no violation individually — and no violations cumulatively — resulted in the deprivation of parental participation or the denial of FAPE or educational benefit for A.F.

29. Accordingly, the Court affirms ALJ's decisions on these issues.

**Whether the District unlawfully changed A.F.'s educational placement in violation of the IDEA?**

30. Plaintiffs' first claim, here, is based on the ALJ's decision of the first issue in the Expedited Decision.

31. For disciplinary changes in a placement greater than 10 consecutive school days (or that are a pattern that amounts to a change of placement), the disciplinary measures applicable to students without disabilities may be applied to a special education student if the conduct resulting in discipline is determined not to have been a manifestation of the special education student's disability ["Manifestation Determinations"]. 20 U.S.C. § 1415(k)(c).

32. To conduct a Manifestation Determination, "the parent, and relevant members of the IEP Team . . . review *all* relevant information in the student's file to

determine[,]" *inter alia*, "if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability." 20 U.S.C. § 1415(k)(1)(E)(I) (emphasis added). "[R]elevant information" includes the student's "IEP, any teacher observations, and any relevant information provided by the parents[.]" §1415(k)(1)(E)(I).

33. The ALJ's decision on this issue was not thorough and careful and therefore, the Court accords the ALJ's decision minimal deference.

34. The ALJ, effectively, required Plaintiffs to disprove Ms. Ramirez's assessment, and placed outsized emphasis on Plaintiffs' lack of expert testimony disproving Ms. Ramirez's assessment. The ALJ concluded that Plaintiffs failed to prove this claim because they "offered no opinions from a professional therapist or school psychologist qualified to opine as to the validity of District's manifestation determination." The evidence that Plaintiffs did provide, the ALJ concluded, "offered no credible evidence that discredited Ms. Ramirez's credible professional opinions… or the findings of the professional and experienced District staff members of the manifestation review team, which included Ms. Amrhein, Ms. Hunter, Ms. Ramirez, Ms. Hayes-Rennels, Ms. Thompson, Student's special education case manager, his general education teacher, and his school counselor." Moreover, the ALJ reasoned, "neither parent had any professional experience in education or school psychology sufficient to discredit the conclusions of the District's professional staff, who unanimously agreed the behavior was not a manifestation of [A.F.'s] . . . disabilities."

35. With respect to A.F.'s significant past history of threatening behavior, the ALJ dismissed Plaintiffs' arguments, reasoning that Plaintiffs "offered no credible evidence, including testimony from an expert, proving that any of Student's past history of behaviors were relevant to Student's threats of retaliation on January 27, 2015." The ALJ held that Plaintiffs "offered no expert testimony proving that his actions were not preplanned, as Ms. Ramirez opined, but instead were impulsive and related to his ADHD; or that his actions were caused by or had a direct and substantial relationship

to his disability of emotional disturbance."

36. In the absence of evidence from Plaintiffs, the ALJ relied on the District's employees — placing particular weight on Ms. Ramirez's conclusions and experience.

37. The ALJ reasoned as follows: A.F.'s "threatening behavior was pre-planned and not impulsive; [A.F.] . . . came to school on January 27, 2015, having already informed other students that he was looking for the students who 'ratted him out' in October 2014. He confronted those students after he returned to school on January 27, and showed no remorse that day or the next when Ms. Thompson interviewed him. His behavior had no direct and substantial relationship to his ADHD, which manifested itself in the classroom. Ms. Ramirez was an experienced school psychologist who understood [A.F.]'s disabilities. She reviewed [A.F.]'s educational records, previous psychoeducational assessment reports and prior IEP's [*sic*]."

38. Having done so, the ALJ did not thoroughly and carefully analyze whether Ms. Ramirez's determination could be reconciled with A.F.'s extensive history, *documented in A.F.'s school records*, of making threats dating back to at least the second grade. Instead, the ALJ, effectively, treated the absence of expert testimony disputing Ms. Ramirez's conclusions as the absence of *any* evidence demonstrating a substantial relationship between A.F.'s threats on January 27, 2015, and his emotional disturbance disability. Moreover, the ALJ failed to address the relevance of the fact that Ms. Ramirez did not have all of the relevant data required to create an IEP — which was the reason the District postponed the finalization of A.F.'s January 27, 2015, IEP for thirty days — with respect to her determination that the January Misconduct was not a manifestation of A.F.'s disability on February 3, 2015. This fact is particularly relevant in light of the ALJ's observation that the District had a duty to review "[a]ll relevant information" "across settings and across times."

39. Applying the snapshot rule, Plaintiffs have proven by a preponderance of the evidence that the January Misconduct was, indeed, a manifestation of A.F.'s disability.

40. Although Plaintiffs did not present evidence, such as expert opinion, challenging Ms. Ramirez's conclusions, ample evidence from A.F.'s school records called Ms. Ramirez's conclusions into question. Indeed, A.F.'s history of threatening behavior dates back over a decade.

41. That A.F.'s conduct was "pre-planned" is not sufficient to demonstrate that the January Misconduct was not substantially related to A.F.'s disability. A.F.'s significant history of making threats includes instances in which his threats were retaliatory or included some pre-planning — such as his plan to exact revenge on his ex-girlfriend. Indeed, the Gun Threat Incident, mere days earlier, demonstrated elements of pre-planning.

42. Thus, in light of A.F.'s significant history of making threats, and the ALJ's insufficient analysis of that history, the Court reverses the ALJ's decision on Plaintiffs' claim one.

**Remaining Issues**

43. In light of this Court's reversal on Plaintiffs' first claim, all remaining issues on appeal — issues 2 and 4 in the Expedited Decision — are moot and will be vacated.

44. Any conclusion of law erroneously categorized as a Finding of Fact is hereby incorporated into these Conclusions of Law.

//
//
//
//
//

Accordingly,

𝕴𝖙 𝖎𝖘 𝕺𝖗𝖉𝖊𝖗𝖊𝖉 that Plaintiffs' first claim (asserted in case number CV 16-05117

TJH) was established by a preponderance of the evidence.

**It is Further Ordered** that Plaintiffs' second and third claims (asserted in case numbers CV 16-05117 TJH and CV 17-00479 TJH), and Defendant's only claim (asserted in case number CV 17-00479 TJH) were not established by a preponderance of the evidence.

**It is Further Ordered** that issue 1 in the Expedited Decision be, and hereby is, **Reversed**.

**It is Further Ordered** that issues 2 and 4 in the Expedited Decision be, and hereby are, **Vacated**.

**It is Further Ordered** that issues 3 and 5 in the Expedited Decision, and all issues in the Non-Expedited Decision be, and hereby are, **Affirmed**.

**It is Further Ordered** that the dismissal of Plaintiffs' Section 504 claim be, and hereby is, **Affirmed**.

**It is Further Ordered** that the District shall convene an IEP meeting within 30 days of this Order and develop an IEP for A.F. which provides him with a FAPE. This IEP shall include at least the following components: (1) Comprehensive dialectical behavioral therapy for the 2017-2018 school year; (2) Accurate present levels of performance; and (3) Appropriate goals.
//

**It is Further Ordered** that the District shall amend A.F.'s February 3, 2015, IEP to reflect that the behavior was a manifestation of his emotional disturbance disability.

𝕴𝖙 𝖎𝖘 𝕱𝖚𝖗𝖙𝖍𝖊𝖗 𝕺𝖗𝖉𝖊𝖗𝖊𝖉 that the District shall reverse A.F.'s expulsion and expunge any records describing it, specifically the expulsion packet; the alleged stipulated suspended expulsion agreement and the Board approval of that document; entries in Infinite Campus regarding the expulsion; and the September, 2015, communications regarding the suspended expulsion.

Date: August 2, 2017

_____
Terry J. Hatter, Jr.
Senior United States District Judge